## DAUPHIN COUNTY.

MAY TERM, 1884, No. 6.                                    JUNE 7, 1884.

# The Harrisburg Car Manufacturing Company *v.* The Lochiel Rolling-Mill Company.

1. B, a consumer of iron, and A, a manufacturer, were engaged in business in the same city, within a short distance of each other. Much of the stock in each was held by the same parties. B contracted with A for the delivery to it of a large quantity of good quality iron at a certain price. A small portion of this iron was delivered, and part of it found to be defective. B thereupon cancelled the contract and refused to receive any more iron under it. The market price of iron had fallen at the time of this refusal below the contract price, and A sought by suit to recover from B the difference in price upon the balance of iron undelivered. The referee to whom the cause was submitted, under the act of 14th May, 1874, found, as a fact, upon sufficient evidence that, throughout this as well as prior similar contracts between the same parties and down to the date of B's refusal to receive any more iron, although no such remedy was provided in the words of the contract, it was the understanding of the parties and their uniform practice that if the iron proved bad, B should reject the inferior article, and permit A to remove it and replace it with iron of the desired quality; and he concluded, as matter of law, that the cancellation of the contract was therefore not the remedy contemplated by the parties. *Held*, not to be error.

2. The contract contained the following language in reference to the delivery of the iron: "To be delivered to us from time to time as we may specify, cut to lengths when ordered, and iron to be delivered during March, April, and May." B's first specification was given on May 13, the last on the 24th of the same month, and on the following 28th of June, when only a small portion of the iron contracted.for had been specified for and delivered, the contract was declared by B to be ended for the reason given above. On the trial B asked the referee to find that, unless the plaintiff by a preponderance of evidence clearly proved that its failure to deliver the iron was entirely due to defendant's failure to furnish specifications therefor, the plaintiff could not recover.

*Held*, that A was not bound to deliver and could not deliver the iron until the quantity, length, and kind were specified, that the delivery of the specifications was a condition precedent, and that the legal inference would be that want of specifications prevented the delivery.

Before MERCUR, C. J.; GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Error to the Court of Common Pleas of *Dauphin County*.

Trespass on the case by The Lochiel Rolling-Mill Company against The Harrisburg Car Manufacturing Company to recover the difference between the contract price and the market price of certain bar-iron alleged, by the

[The Harrisburg Car Manfg. Co. *v.* The Lochiel Rolling-Mill Co.]

plaintiff, to have been contracted for by the defendants, and afterwards refused to be received by them. Plea, *non-assumpsit*, with leave, &c.

By agreement filed in accordance with the act of 14th May, 1874, (P. L., p. 166,) the cause was submitted to Hon. JOHN J. PEARSON, as referee, by whom the following facts were found:

The Harrisburg Car Manufacturing Company, on February 10, 1880, addressed to the plaintiff the following note:

"*Lochiel Rolling-Mill Company:*

GENTLEMEN: Please enter our order for five hundred tons good quality of iron, to be delivered to us from time to time as we may specify, cut to lengths when ordered, at the price of three and three fourth cents per pound, half inch below; all rounds to bear the usual extras. Terms: Four months flat, from monthly settlements. Iron to be delivered during March, April, and May.

Respectfully yours,

(Signed)           W. T. HILDRUP,
*Superintendent.*"

This was indorsed: "Accepted. J. H. Landis, Superintendent Lochiel Rolling-Mill Company, February 10, 1880."

Specifications under this contract were first given to plaintiff on May 13, 1880, for 560 pounds, and from time to time subsequently until May 24, 1880, when the quantity of iron specified for and delivered had amounted to 34,770 pounds. After this date, no more iron was ever delivered, ordered, or specified for under the above contract; and on June 28, 1880, the following note was received by plaintiff:

"HARRISBURG CAR MANUFACTURING COMPANY,
HARRISBURG, PA., *June 28, 1880.*

J. H. LANDIS, *Superintendent, present:*

DEAR SIR: I have been obliged to discontinue all specifications for iron to you, and must cancel all contracts. I wish you would do me the favor to visit me at our works to see the pile of your iron we have on hand that has broken in our efforts to work it. This I ask that you may have the same knowledge of facts that we have, and this has accumulated from iron sent us after frequent notifications of the bad quality of the iron sent us.

Respectfully yours,

W. T. HILDRUP,
*Superintendent.*"

[The Harrisburg Car Manfg. Co. *v.* The Lochiel Rolling-Mill Co.]

The price of iron at the time this note was written had fallen 2.35 cents per pound, and the plaintiff afterwards, during July and August, 1880, sold it to defendant and others at that price.

The plaintiff and defendant were each carrying on extensive business in the city of Harrisburg, and about a mile apart. The character of the business done by each was known, generally, to the agents of the other, and a number of persons were holders of the stock of both companies. The defendant was manufacturing railroad cars at the rate of fourteen or fifteen cars per day, requiring about a ton of iron to be used in making each car. The plaintiff was making iron extensively in its furnaces and rolling-mills. During the superintendency of Mr. Landis, Mr. Hildrup had ordered, purchased, and received one hundred and fifty tons of its iron in November, 1879, and five hundred tons on a contract made the 27th of December, 1879. Nearly all of the iron delivered by plaintiff to defendant, under all of these contracts, was used by it in manufacturing freight cars, and was known by plaintiff's agents to be intended for that purpose. The referee reported as follows :

"Under the contract now in suit, we are satisfied from all of the evidence that it was expected that the iron should be not only of good quality, but of the kind suitable for car-building—expected to be used for that purpose, and very many of the orders calling for best refined iron, the kind of order never objected to. This being a contract between a customer and manufacturer of the article ordered, it is fair to presume that the latter intended to warrant the goods to be of good quality and suitable for the purpose for which ordered, and were for building railroad cars, [such as] may be used with safety to the men conducting the trains, and also to the goods carried. The strength and safety of the cars depend greatly on the goodness of the iron used in its construction. Was the iron furnished by the plaintiff of that quality? It is conceded by plaintiff's witnesses, that in making the iron, three fourths of cinder was used and but one fourth of iron ore ; but it is contended that good iron may be made of such an admixture, and many respectable and experienced iron-masters testify to that effect, whilst others equally respectable and experienced testify that such iron is not reliable. Nearly all agree that such iron, if offered in the market as cinder iron, would not sell at the same price with that made of iron ore, and for the purpose of car-building, would not sell at all ; yet it is pretty clear

that the defendant's agent well knew that a portion of cinder was used in the manufacturing at plaintiff's works, but the proportion or quantity was not known or whether the iron was so far refined as to render its use harmless. It is conceded that the iron delivered to the defendant merely went through the rough, the ordinary process of smelting, puddling, and rolling a single time.

The practice of using cinder is of late invention or discovery. A few years ago such a process would not have been thought of, but modern discovery has shown that good iron may be made to advantage by the use of a portion of cinder. It is conceded that it requires much skill and knowledge, with very careful handling, great care in the blast furnace and in fluxing the ore and cinder, and many iron-masters will not pretend to use more than one sixth part cinder to five sixths of ore ; others use one half, and a few, as the present plaintiffs, three fourths. Besides, all agree that there is as great difference in the quality of the cinder as in that of the ore. Whilst we can well understand that the defendant's superintendent may well be afraid to use iron made of such distrusted materials, yet we must say that he had no right to reject it under the present contract, if it proved good, yet he had full power, and it was his duty, to reject it if it proved bad.

But what was the mode of redress provided for under the contract if that was the case? Not to cancel the contract, but to reject the vicious article and permit the plaintiff to remove it. There is no such remedy provided in words, but we are satisfied that such was the understanding of the parties, and such was their uniform practice down to the 20th of June, when the defendant's agent resorted to the harsher remedy of declaring the contract at an end, and refusing to receive any more iron under it. * * * We find, in looking over the correspondence of the parties, that Mr. Hildrup was not only urging Mr. Landis frequently to hasten the delivery of his iron, but to send of better quality—to remove the bad and to furnish good. The evidence shows that almost every car or wagon load carried back a portion that was rejected. * . * * Under the present contract, but 34,770 pounds were delivered, but the quality was not improved, for out of that iron a considerable quantity was retained by the defendant's agent as a sample of the kind of iron sent. This was exhibited to Mr. Landis, plaintiff's agent, who said it was bad iron ; but as to some of that he might have been mistaken, as others, on trying it in dif-

ferent ways, thought it reasonably good.     *     *     [The] attempt at cancellation occurred twenty-eight days after the time for delivering the last of the iron had expired by the words of the contract.   Yet we are satisfied that no part was expected or intended to be delivered until ordered.

The plaintiff, on the trial, called witnesses to prove that when this contract was cancelled by the defendant and a refusal to give any more orders, it had on hand, ready for delivery, six or seven hundred tons of iron.   *   *   * On the other hand, the defendant has proved, on full examination, that plaintiff had at that time, suitable for car-building, or of a kind ever ordered by the defendant at any time, but 271 tons, and we are of opinion that none other ought to be considered or allowed for.

We are also well satisfied that this contract was not cancelled in order to buy iron cheaper, but because that furnished had proved of bad and not of trustworthy quality; that there was great want of punctuality in its delivery, and its use attended with much trouble, vexation, and additional expense, and also that the plaintiff had not, on the 28th of June, prepared for delivery of any more iron than the quantity for which we have allowed."

The referee's award was in favor of the plaintiff for $8,802 08, made up as follows :

"271 tons of iron, computed as lost on the
    price, at 1.40 per cent., . .     . . . . . .     $7,588 00
Interest, by way of damages, from July 1,
    1880, to March 1, 1883,     . . . . . . . .     1,214 08
                                                   _____
                                           .       $8,802 08"

The following exception (*inter alia*) was filed by the defendant to the award of the referee :

*First.* The referee having found that, under the contract, plaintiff was bound to furnish a warranted quality of bar iron, suitable for car-building purposes, (which was understood, as shown by orders accepted without objection, to be "best refined iron,") and having found also that the iron manufactured and delivered was made from a mixture of three fourths cinder and one fourth ore, (an unusual and distrusted mixture,) that said iron was made through "the ordinary process of smelting, puddling, and rolling a single time," should have concluded and found, as matter of fact, that the iron delivered to defendant, and remaining on hand at plaintiffs' works, was not of the contract quality and standard, and erred in concluding, as matter of law, that defendant had not the

right to cancel the contract, and the only "remedy was to reject the vicious article and permit the plaintiff to remove it."

Overruled.

The following points, *inter alia*, were submitted by the defendant:

"*Second.* The quality of the iron to be delivered by the plaintiff, in pursuance of the aforesaid contract, (as appears from the orders of December 27, 1879, and February 10, 1880, as also from the several specifications furnished by the defendant and accepted by the plaintiff without objection,) was 'best refined iron,' of 'warranted quality for car-building purposes.' The defendant was not bound to accept iron of any inferior grade; would have been criminally negligent had it accepted and used iron unfit for car purposes; and if, from the evidence, it satisfactorily appears that the plaintiff, after February 10, 1880, habitually and frequently delivered, under said contract, iron, much of which was found to be unfit for the purposes aforesaid, then the defendant had the right to refuse to accept further deliveries, and to rescind the contract; and such refusal and rescission create no cause of action against the defendant. .

*Answer.* There was great want of skill and care manifested in the manufacture of much of this iron, and the same was properly rejected and returned to the plaintiff. Yet we are of opinion that such act alone is no ground to rescind the contract, without notice that such course would be adopted if persisted in. Had such notice been given, the plaintiff might have pursued the course afterwards adopted—used less cinder or of better quality.

*Sixth.* There is no evidence, or pretense even, that defendant rescinded, or attempted to rescind, the contract until nearly one month had elapsed after the time within which plaintiff had agreed to deliver the iron; and unless plaintiff, by a preponderance of evidence, clearly proves that its failure to deliver the iron was entirely due to defendant's failure to furnish specifications therefor, the plaintiff cannot recover.

*Answer.* The evidence clearly shows that defendant did not rescind, or attempt to rescind, the contract until nearly a month after the time fixed for its completion. But it is equally clear that the plaintiff was not bound to deliver, and could not deliver, the iron until the quantity, length, and kind were specified. The delivery of specifications was a condition precedent, and we are bound to infer that want of specifications prevented the delivery."

[The Harrisburg Car Manfg. Co. *v.* The Lochiel Rolling-Mill Co.]

Judgment was entered for the plaintiff upon the original finding of the referee, whereupon defendant took the above writ, assigning for error, *inter alia*, the overruling of its exception, and the answers to its points as above.

*Fleming & McCarrell* and *Louis W. Hall* for plaintiff in error.

It is well settled that a vendee has a right to rescind, and may refuse to accept an article not of the quality designated by the contract: Hoare *v.* Rennie, 5 H. & N., (excln.,) 19 ; Honck *v.* Muller, L. R., 7, Queen, B. Div., 92 ; Withers *v.* Reynolds, 2 B. & Ad., 882 ; Scott *v.* Coal Co., 8 Norris, 231, (S. C. 7, W. N. C., 289 ; Norrington *v.* Wright, 9 W. N. C., 422, (S. C. A. L. R., 395.)

It clearly appears that the plaintiff below either could not or would not deliver the iron within the specified time. The defendant was required by its contract to deliver the cars on a certain day, and the iron contract was made to enable the defendant to finish the cars in the required time. Hence time was clearly of the essence of the contract: Shaw *v.* The Turnpike Company, 2 P. & W., 458 ; Lester *v.* McDowell, 6 Harris, 91 ; Parshall's App., 15 P. F. S., 234 ; Kitchen *v.* Stokes, 9 W. N. C., 48.

We contend that the learned referee erred in concluding that there was an understanding, agreement, or course of dealing between the parties below, which required the car company to return all defective bars to the iron company, and permit the latter to replace them with others. It certainly was no part of the express agreement between the parties. Even if an agreement to that effect had been made, the courts would construe it to meet the reasonable understanding of the parties. The persistent and repeated delivery of a defective and inferior article cannot be protected indefinitely by any custom or agreement that it shall be returned so as to give opportunity to improve its quality.

There must be a limit, and even beyond any reasonable limit the defendant went in this case in returning defective iron to be replaced. That acts of indulgence do not make a binding usage is clearly decided: Lord *v.* Burbank, 18 Maine, 178 ; Bank *v.* Grafflin, 31 Maryl., 511 ; Whitmore *v.* Iron Co., 2 Allen, 52.

*H. M. North* and *Weiss & Gilbert* for defendants in error.

The contract of February 10, 1880, was severable in its nature, and the plaintiff in error was required by law

[The Harrisburg Car Manfg. Co. v. The Lochiel Rolling-Mill Co.]

to take the balance of iron for which it had contracted, even if the first delivery had been of faulty or imperfect iron: Cutter v. Powell. 2 Sm. Leading Cases, 7 and N.; Oil Co. v. Brewer, 16 P. F. S., 351; Morgan v. McKee, 27 P. F. S., 228; Scott v. Coal Co., 8 Norris, 231; Jonassohn v. Young, 4 Best & Smith, 296.

October 6, 1884, the opinion of the court was delivered by PAXSON, J.:

We have examined this voluminous record with some care, and have been unable to find any serious errors in the learned referee's findings of fact or conclusions of law. Whatever might have been the right of the plaintiffs in error to rescind the contract by reason of the defective quality of the iron furnished by the rolling mill company, had there been no understanding between the parties in reference thereto, yet the learned referee has found upon sufficient evidence that a cancellation of the contract was not the remedy contemplated by the parties. This he has found in part from their previous dealings, not a custom in its legal sense, but a previous course of dealing in regard to the very point in controversy. There had been prior contracts between these parties for the sale and delivery of iron, and the mode of redress for the delivery of iron of an inferior quality was, as found by the referee, to remove the same, and substitute other iron of the desired quality. · It does not matter that no such arrangement appears upon the face of the contract. If the parties acted upon it, we cannot say, in view of the situation of these companies, and the intimate connection between them, the result of much of the stock in each being held by the same parties, that it was error in the learned referee to hold that the cancellation of the contract was not the remedy contemplated by the parties.

It would serve no good purpose to enter upon a discussion of the details of the case. It is admittedly close, but we think the learned referee has sufficiently vindicated his conclusions in his opinion upon the law and the facts.

Judgment affirmed.